In the Matter of Michael L. RICHMOND.

No. C2–88–2009.

Court of Appeals of Minnesota.

Dec. 20, 1988.

Nancy K. Olkon, Minneapolis, for appellant Richmond.

Thomas L. Johnson, Hennepin County Atty., Jack Owens, Margaret A. Daly, Asst. County Atty., Minneapolis, for respondent.

Considered and decided by WOZNIAK, C.J., and PARKER and SHORT, JJ., without oral argument.

## OPINION

WOZNIAK, Chief Judge.

Michael Richmond appeals from both a judgment of commitment and a judgment continuing his commitment as a mentally ill and dangerous person. We affirm the trial court's decision that Richmond is mentally ill, but reverse the court's continuation of Richmond's commitment as mentally ill and dangerous to the public.

## FACTS

In early 1988, Richmond became involved in several incidents with the police. During April and May 1988, Richard made numerous telephone calls to the Brooklyn Park Police Department, voicing vague complaints. He made no threats during these calls. In May 1988, a police officer discovered Richmond and another man fighting in downtown Minneapolis. Although Richmond had a knife in his possession, he did not threaten or attempt to use the knife on anyone.

On May 15, 1988, Richmond informed an acquaintance that he felt she would be the victim of harm in the future. At Richmond's request, his acquaintance called the police. Officer Peter Palmer arrived and spoke with Richmond, who expressed concern because he believed an operator was interfering with the telephone lines in his apartment.

Officer Palmer testified that about 10 or 15 minutes later, he received a request to go to Richmond's apartment. When he arrived, Richmond told Officer Palmer that he believed police officers were plotting to kill someone in his building.

Approximately 15 or 20 minutes later, Officer Palmer received a call on his radio stating that Richmond had again called the police and had become hysterical. One of Richmond's girlfriend's children, in Richmond's care at the time, interrupted the call and asked that an officer be sent to Richmond's apartment. Officer Palmer testified that he returned to Richmond's apartment building, but Richmond screamed at him to get away and went into his apartment. Officer Palmer called for another squad, and the police knocked on Richmond's door and asked to check on the children. At that point, Richmond screamed that he would "blow away" the first officer who came through the door. The SWAT team was called, and Richmond's neighbors were evacuated. Although Richmond never expressly stated that he had a gun or a knife, Officer Palmer testified that Richmond said: "Come in here, I am going to cut you" and "If you come in here, I will pull the trigger." Officer Palmer testified that at another point, Richmond stated: "It's all over and I'm covered with blood." Richmond indicated a belief that the police had killed a prostitute and were going to kill him. Richmond also indicated that he was afraid the police would hurt the children.

When the police finally obtained a passkey and entered Richmond's apartment, they found a butter knife lying on the living room floor. The children were in the

bathroom and Richmond was leaning on the bathroom sink. The children appeared terrified, but were not injured. Richmond was forcibly taken to the hospital.

A petition was filed for the commitment of Richmond as mentally ill and chemically dependent. An amended petition was subsequently filed, requesting that Richmond be committed as mentally ill and dangerous.

The court-appointed examiner, Dr. Robert P. Jeub, concluded that Richmond exhibited a paranoid disorder. Due to scheduling difficulties, a new examiner, Dr. Chris M. Meadows, was appointed by the court. Dr. Meadows described Richmond as suffering from a paranoid or delusional disorder.

A hearing was conducted on June 14, 1988. Dr. Meadows testified that based upon his interview with Richmond, his review of the records, and the testimony offered, he believed Richmond was mentally ill. Although there was evidence that Richmond was mentally retarded, Dr. Meadows found no indication that Richmond's behavior was caused by the mental retardation, rather than mental illness.

Following the hearing, the court found that Richmond was mentally ill and dangerous, based upon the street fight, the incidents on May 15, and statements by Richmond while hospitalized pending trial.

On August 11, 1988, a "60-day treatment report" was filed with the court. This report indicated that Richmond's diagnosis was "bipolar disorder *vs.* a mixed substance abuse disorder." The report concluded that in order to determine the nature of Richmond's problem, his treatment team recommended commitment as mentally ill for a period of up to six months at the Minnesota Security Hospital.

On August 25, 1988, the court conducted a "60–90 day review hearing" pursuant to Minn.Stat. § 253B.18 (1986). Following the hearing, the court issued an "Order Continuing 60-day .18 Hearing." In its order, the court concluded that there was clear and convincing evidence that Richmond continued to be mentally ill; however, the court continued the hearing to determine whether Richmond was mentally ill and dangerous. The court ordered that the Minnesota Security Hospital file a supplemental 60-day report on or before December 10, 1988.

## ISSUES

1. Does the record contain clear and convincing evidence that Richmond was mentally ill?

2. Did the trial court err by continuing Richmond's commitment as mentally ill and dangerous?

3. Did the trial court err by appointing a substitute examiner without notice to Richmond?

## ANALYSIS

1. The petitioner has the burden of proving by clear and convincing evidence that a proposed patient is mentally ill. Minn.Stat. § 253B.09, subd. 1 (1986). A "mentally ill person" is defined as:

[A]ny person who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (b) poses a substantial likelihood of physical harm to self or others as demonstrated by (i) a recent attempt or threat to physically harm self or others * * * as a result of the impairment. This impairment excludes * * * (b) mental retardation.

Minn.Stat. § 253B.02, subd. 13 (1986).

 Our review is limited to determining whether the trial court complied with the Minnesota Commitment Act and made the required findings and conclusions, which must be based on the evidence. *In re Peterson*, 356 N.W.2d 746, 748 (Minn.Ct. App.1984). We will not reverse the findings of the trial court unless they are clearly erroneous. *Id.*

 In its initial order of commitment, the court found that Richmond has a sub-

stantial psychiatric disorder of thought and mood and a gross impairment of his judgment, behavior, ability to recognize reality and to reason and understand. This finding is supported by the report of Dr. Jeub and the report and testimony by Dr. Meadows.

The court also made sufficient findings regarding the connection between Richmond's actions and his mental illness. The court's order described Richmond's recent actions which led to the petition for his commitment. The court also found that while hospitalized, Richmond described several delusions, which the trial court found were the result of his mental illness. Finally, the court found that as a result of his mental illness, Richmond "distorts events and sees people as threatening to attack him who are not in that posture with regard to him."

Richmond claims there is no evidence that his actions were caused by his mental illness. Dr. Meadows, however, testified that there was a connection between Richmond's mental illness and the May 15 incident involving the police.

Richmond also argues that his threats to the police during the May 15 incident were meaningless, since he did not actually possess a gun or sharp knife. Richmond concludes there was no real attempt or threat to physically harm anyone. We disagree. The court found:

> 9. The situation escalated in seriousness as the police responded to things they heard Respondent say through his locked doors, he threatened to kill someone who might forcibly enter his apartment and spoke about shooting or cutting people. He said he would die to protect his children * * *. Kicking and banging could be heard inside respondent's apartment and he was screaming at the top of his lungs. After more than five hours the police entered respondent's apartment forcibly under cover of tear gas and removed Respondent in four point restraints. It took five men to subdue Respondent.

Richmond claims the evidence at the review hearing was insufficient to support the court's finding that he continued to be mentally ill. Douglas Fox, a member of Richmond's treatment team, indicated that the treatment team recommended continued commitment as mentally ill for observation in order to determine for certain whether Richmond was mentally ill.

■ It is the trial court and not the experts who must determine whether a proposed patient is mentally ill within the meaning of the statute. *In re Moll,* 347 N.W.2d 67, 70 (Minn.Ct.App.1984). The standard of proof is clear and convincing evidence, not proof beyond a reasonable doubt. Minn.Stat. § 253B.12, subd. 4 (1986). There was evidence that Richmond was cycling out of a manic phase of bipolar disorder during his stay at the Minnesota Security Hospital.

Richmond notes that after he was hospitalized, his condition improved, resulting in a May 24 court order stating that he was competent to agree to stay at North Memorial Medical Center until the hearing. Competency and mental illness, however, are two different issues. *See generally In re Miner,* 411 N.W.2d 525 (Minn.Ct.App. 1987), *pet. for rev. denied* (Minn. July 28, 1988).

■ 2. Minn.Stat. § 253B.02, subd. 17 (1986) defines a person who is "mentally ill and dangerous to the public" as:

> [A]ny person (a) who is mentally ill; and (b) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

Following an initial commitment as mentally ill and dangerous, a review hearing must be held "within 14 days of the court's receipt of the written treatment report, if one is filed, or within 90 days of the date of initial commitment, whichever is earlier, unless otherwise agreed to by the parties." Minn.Stat. § 253B.18, subd. 2 (1986).

If the court finds at the [review] hearing * * * that the patient continues to be mentally ill and dangerous, then the court shall order commitment of the proposed patient for an indeterminate period of time.

Minn.Stat. § 253B.18, subd. 3.

If the court finds that the patient qualifies for commitment as mentally ill, but not as mentally ill and dangerous to the public, the court may commit the person as a mentally ill person and the person shall be deemed not to have been found to be dangerous to the public * * *.

Minn.Stat. § 253B.18, subd. 2. The legislature has not authorized the court to hold a proposed patient for additional observation to determine whether he is dangerous, as the court did here.

The court stated in its order:

It is impossible * * * for the court to decide at this time whether the respondent continues to be mentally ill and dangerous to the public.

Neither the initial commitment order nor the order continuing the commitment supports a determination of dangerousness. The court erred by continuing the hearing to determine whether Richmond's mental illness caused him to be dangerous.

■ 3. Richmond claims he was never served with the notice of the appointment of Dr. Meadows. There is no evidence that Richmond objected to this appointment at the hearing, and he may not raise the argument for the first time on appeal. *See In re Niskanen,* 385 N.W.2d 323, 328 (Minn. Ct.App.1986).

### DECISION

The record supports the court's determination that Richmond is mentally ill. The court erred by committing appellant as mentally ill and dangerous. We will not review an issue which is raised for the first time on appeal.

AFFIRMED IN PART AND REVERSED IN PART.